## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

SHERRELL TOWNS     )
           )
     Plaintiff,  )
           )
vs.           )
           ) **Case No. 13-cv-1269-MJR-SCW**
TERRI DETHROW,    )
L. MAUE,       )
TRAVIS LINDSEY,    )
TODARO,       )
REBECCA COWAN,    )
BRANDIN ANTHONY,   )
ROY GRATHLER, and    )
MIFFLIN       )
           )
           )
     Defendants. )

## MEMORANDUM AND ORDER

**REAGAN, Chief District Judge:**

On December 10, 2013, Plaintiff Sherrell Towns filed a *pro se* civil rights action against a number of prison employees at the Menard Correctional Center, alleging that his constitutional rights were violated during his time at Menard. (Doc. 1). The Court screened Plaintiff's complaint pursuant to 28 U.S.C. § 1915A and found that he had stated six claims that survived threshold screening: 1) that on October 31, 2011, Maue intimidated and threatened Plaintiff in retaliation for Plaintiff's October 30, 2011 grievance in violation of the First Amendment; 2) that on November 11, 2011, Maue, Todaro, and Chandler intimidated and threatened Plaintiff in retaliation for Plaintiff's

October 30, 2011 grievance in violation of the First Amendment; 3) that on November 11, 2011, Lindsey issued Plaintiff a disciplinary ticket in retaliation for writing grievances in violation of the First Amendment; 4) that Mifflin, Cowan, and Anthony conducted a disciplinary hearing, convicted, and penalized Plaintiff in retaliation for Plaintiff's past lawsuits and in a manner that denied him due process; 5) that there was a conspiracy between Dethrow, Maue, Lindsey, Todaro, Chandler, and Grathler to retaliate against Plaintiff in violation of the First Amendment; 6) that Defendants' violated the Illinois Constitution. (Doc. 7). As the case progressed, the Court received notice that Chandler died, and he was dismissed for failure to substitute. (Doc. 123).

On October 27, 2015, Defendants moved for summary judgment. Plaintiff responded and the Court deemed the response timely, so the motion for summary judgment is now ripe for ruling. For the following reasons, the Court **GRANTS in part** and **DENIES in part** the Defendants' motion for summary judgment.

## Factual Background

Plaintiff has been incarcerated at Menard since 2002. (Doc. 107-1, p. 2). At the time of the relevant events, he was assigned to the South Lowers cell house, cell 317. (Doc. 107-1, p. 6). On October 23, 2011, Correctional Officer Dethrow toured Plaintiff's gallery asking the inmates if they would like to sign-up for barbershop. (Doc. 107-1, p. 3). She inquired if Plaintiff's cell mate would like to sign up but then left the cell without inquiring whether Plaintiff would like to go to barbershop. (Doc. 107-1, p. 3). Dethrow told Plaintiff that he did not look like he needed a haircut and that inmates were not allowed to get haircuts as long as they looked like their prison ID. (Doc. 107-1,

p. 3). Plaintiff asked Dethrow if that was a new rule. (Doc. 107-1, p. 3). Dethrow told him to take it up with the Lieutenant. (Doc. 107-1, p. 3). Plaintiff had never experienced problems with Dethrow prior to this incident. (Doc. 107-1, p. 4). Plaintiff submitted the affidavit of John Lee, who was housed next to Plaintiff in cell 316 during the relevant events, which corroborates Plaintiff's version of events. (Doc. 111-1, p. 20

Prior to this event, inmates submitted requests for barbershop in writing by putting a slip in the "barbershop box." (Doc. 107-1, p.3). Call passes would be issued based on submissions, but the staff had recently removed the barbershop box just before Dethrow came around to make a list. (*Id*.). Plaintiff has been in the habit of going to the barbershop around once a month. (*Id*.). At the time of this incident, Plaintiff's hair was probably around 1 inch long in an afro-style haircut. (*Id*. at 5).

Plaintiff waited in his cell for the Lieutenant to come, but Officer Maue and Sergeant Grathler showed up instead around ten to fifteen minutes after the exchange with Dethrow. (Doc. 107-1, p. 5). Grathler asked for Plaintiff's ID and Plaintiff gave it to him. (Doc. 107-1, p. 5). Maue asked Plaintiff why he was giving Dethrow problems and Plaintiff denied doing so, stating that he just wanted clarification about the barbershop policy. (Doc. 107-1, p. 5). Maue told Plaintiff that he did not need to go to the barbershop and that his current level of grooming was good. (Doc. 107-1, p. 6). Plaintiff told Maue that it was his right to go to the barbershop. (Doc. 107-1, p. 6). Maue told him that if he said anything further about the policy, he would go to segregation. (Doc. 107-1, p. 6). Plaintiff states that Maue was an aggressive and authoritative guard who choose to use his authority like a battering ram. (Doc. 107-1, p.

3

6). Maue would talk down to inmates. (Doc. 107-1, p. 6). Plaintiff tries to avoid Maue and Grathler for those reasons. (Doc. 107-1, p. 6). Maue does not recall speaking to Plaintiff on this date. (Doc. 107-2, p. 1). Grathler does not recall speaking to Plaintiff on this date. (Doc. 107-3, p. 1). Inmate Lee's affidavit also corroborates Plaintiff's version of events. (Doc. 111-1, p. 21). Aryules Bivens, an inmate in Cell 314 of South Lowers, also submitted an affidavit confirming Plaintiff's account. (Doc. 111-1, p. 24).

After Maue and Grathler left, Plaintiff began working on a grievance regarding the incident. (Doc. 107-1, p. 7). Plaintiff wrote one emergency grievance to the Warden and also sent a copy to the ARB, because in his experience grievances that allege officer misconduct get "lost." (Doc. 107-1, p. 7-8). The ARB ordered the Warden to look into the grievance as a result of Plaintiff's correspondence. (Doc. 107-1, p. 9). Plaintiff was surprised when the Warden expedited the grievance as an emergency. (Doc. 107-1, p. 9). Plaintiff believes that the Warden then ordered internal affairs to investigate the grievance. Plaintiff testified that he dated the grievance October 23, but believes he actually finished and sent it later in the week, possibly on October 27. (Doc. 107-1, p. 10). The parties appear to agree that the grievance was submitted on October 30, 2011.

On October 31, 2011, at around 2 pm, Maue came to Plaintiff's cell "amped up." (Doc. 107-1, p. 12). Plaintiff does not believe that Maue was assigned to Plaintiff's gallery that day because Maue was usually assigned to one gallery. (Doc. 107-1, p. 12). Plaintiff had never seen Maue assigned to that gallery prior to October 31st. (Doc. 107-1, p. 1). Maue had the baton used for bar rapping, a process guards use to check the integrity of the cell bars. (Doc. 107-1, p. 12). Bar rapping usually takes place at 7 am in

the morning.  (Doc. 107-1, p. 12).  Maue rapped a few cells to the left and right of Plaintiff's cell.  (Doc. 107-1, p. 12).  Plaintiff described the bar rapping that day as "aggressive[], harder than usual."  (Doc. 107-1, p. 13).  In Plaintiff's experience, bar rapping usually has a certain rhythm to it—most guards are focused on checking the integrity of the bars, and not on aggravating the inmates.  (Doc. 107-1, p. 13).  Plaintiff does not believe that Maue could have heard anything wrong with the cell bars because he was rapping fast and loud.  (Doc. 107-1, p. 13).  Maue rapped five to ten cells twice.  (Doc. 107-1, p. 13).  Maue did not do the entire gallery.  (Doc. 107-1, p. 13).

As a result of the bar rapping, paint chips from the cell bars flew into Plaintiff's eyes.  (Doc. 107-1, p. 13-14).  The tower officer then said something to Maue and Maue replied "I'm going to do this shit every day until they shut the fuck up." (Doc. 107-1, p. 14).  Plaintiff said nothing to Maue.  (Doc. 107-1, p. 14).  Plaintiff then wrote a grievance about this incident and submitted it to the Warden's office as an emergency and to the ARB that same night.  (Doc. 107-1, p. 14-15).  Inmate Lee submitted an affidavit attesting to Plaintiff's version of events.  (Doc. 111-1, p. 21).  Inmates Bivens and Mitchell also submitted affidavits, and they too corroborate Plaintiff's account.  (Doc. 111-1, p. 25, 46).

Maue submitted an affidavit that bar rapping occurs on each shift.  (Doc. 107-2, p. 2).  It can occur at any time, and may occur more than once per shift.  (Doc. 107-2, p. 2).  Defendants admitted, however, that it was the routine and established practice for officers at Menard to bar rap the cells at or near the beginning of the 7 am to 3 pm shift; it was not the routine practice to bar rap between 2 and 3 pm.  (Doc. 111-1, p. 49-50).  An officer may be directed to rap certain cells.  (Doc. 107-2, p. 2).  However, pursuant to

5

Defendants' admissions, it is not routine for correctional officers to rap the cell bars of only a certain number of cells when doing regular checks. (Doc. 111-1, p. 50).

In order to rap the bars, an officer must check out a bar and list it as checked out on the tool issuance log. (Doc. 107-2, p. 2). Tools are kept in the tool crib, and the correctional sergeant holds the key. (Doc. 107-2, p. 2). A correctional officer cannot obtain the bar to rap the cells without the sergeant opening the tool crib and signing out a tool. (Doc. 107, p. 2). The tool log shows that the bars used for rapping were only checked out from 6:50 am to 7:25 am; no bars were checked out around 2 pm. (Doc. 107, p. 2). Other tools are not available for bar rapping. (Doc. 107-2, p. 2).

On or about November 6, 2011, Plaintiff came back from chow to find a letter on his pillow, which he included with his complaint in this case. The letter was written on stationary paper only used by officers. (Doc. 107-1, p. 15-16; Doc. 111-1, p. 76). The letter states: "Dearest Sherrell, I am hopeful this finds you well & healthy enough to carry out my recommendation. After a careful & thorough review of your grievance, the following is my recommendation as per grievance procedure dated 1/79. Be advised that you may kindly fellate yourself. After fellation if you may also fornicate with yourself to completion. Stay up." (Doc. 1-2, p. 45). Plaintiff believes that an officer wrote this letter because it was written on officer stationary and also because it would have been difficult for an inmate to have time to drop it off at his cell while the gallery was at chow. (Doc. 107-1, p. 16). Plaintiff also does not believe another inmate would have made comments about Plaintiff's grievance activity. (Doc. 107-1, p. 16).

On November 8, Dethrow came to Plaintiff's cell and asked him if he had filed a grievance about barbershop. (Doc. 107-1, p. 17). Plaintiff confirmed that he had. (Doc. 107-1, p. 17). Dethrow then asked how Plaintiff had sent the grievance. (Doc. 1, p. 31). Plaintiff told her he sent it through the mail. (Doc. 1, p. 31). Dethrow also said that the South Lowers staff had discussed the grievance and could not believe that Plaintiff filed a grievance over such a small matter. (Doc. 1, p. 31). Dethrow then asked if Plaintiff had achieved his desired result, but Plaintiff replied that he didn't think it was right to discuss his grievance with her. (Doc. 107-1, p. 17). Dethrow then replied: "I just want you to know that I am the type of person that will make sure you get what you got coming." (Doc. 107-1, p. 17). Plaintiff later found out that he had been scheduled for a haircut on November 10, 2011, but had not received one. (Doc. 107-1, p. 31).

Plaintiff's grievance on this issue was received by the grievance officer on November 3, 2011 and reviewed on November 10, 2011. (Doc. 111-1 p. 70). The report indicates that Brad Thomas investigated Plaintiff's complaints and was told by the guard that Plaintiff was put in for barbershop with the rest of his gallery on October 27, 2011, but that the cuts were cancelled due to a lockdown. (Doc. 111-1, p. 70, 72). Thomas completed his investigation on November 7, 2011. (Doc. 111-1, p. 72). It noted that Plaintiff was scheduled for a cut on November 10th. (Doc. 111-1, p. 70). The CAO, David Rednour, signed off on the grievance on November 14, 2011. (Doc. 111-1, p. 70).

On November 11, 2011, Officer Lindsey came onto the gallery and rapped the bars at approximately 8:00 am. (Doc. 107-1, p. 17). Lindsey was not the gallery officer. (Doc. 107-1, p. 18). Plaintiff did not say anything to Lindsey and did not think anything

of the rapping—as far as he was concerned, Lindsey was doing his job.  (Doc. 107-1, p. 18).  Plaintiff did not hear any comments from the inmates on the gallery during the bar rapping.  (Doc. 107-1, p. 18).  Inmates Lee, Bivens, and Mitchell testified via affidavits that they did not hear Plaintiff say anything to Lindsey.  (Doc. 111-1, p. 22, 26. 47).

The bar rapping woke Plaintiff up and he began making coffee and watching X-Men.  (Doc. 107-1, p. 18).  About fifteen minutes later, Dethrow appeared at Plaintiff's cell and told him to pack up, as he was moving to segregation.  (Doc. 107-1, p. 18).  Dethrow told him he had gotten a ticket the night before.  (Doc. 107-1, p. 18).  Plaintiff began packing his property and five minutes later Officer Chandler showed up and told him to hurry.  (Doc. 107-1, p. 18).  Plaintiff told him he had not been anticipating going to segregation and that he needed a moment.  (Doc. 107-1, p. 18).  Prior to this incident, Plaintiff had not received a disciplinary report for two years.  (Doc. 111-1, p. 30).

Officer Lindsey submitted an affidavit confirming that he was bar rapping on November 11, 2011.  (Doc. 107-4, p. 2).  According to him, when Lindsey passed Plaintiff's cell, Plaintiff cursed at him and asked him why he was rapping the gallery when he was not the gallery officer.  (Doc. 107-4, p. 2).  Lindsey told Plaintiff that an officer does not have to be assigned to a particular gallery to bar rap it.  (Doc. 107-4, p. 2).  Plaintiff then told Lindsey that he would "fuck" up the next individual who rapped the gallery without being assigned to it.  (Doc. 107-4, p. 2).  Plaintiff also allegedly stated that he was tired of correctional officers doing whatever they wanted.  (Doc. 107-4 p. 2).  Lindsey wrote Plaintiff up based on these statements.  (Doc. 107-4, p. 2; Doc. 107-4, p. 4).

Maue was listed as a witness.  (Doc. 107-4, p. 4).  Lindsey alleges that he was not aware of any grievances or lawsuits that Plaintiff may have filed.  (Doc. 107-4, p. 2).

Chandler escorted Plaintiff to the cage where Maue, Todaro, and Clover were present.  All four officers surrounded Plaintiff, a point corroborated by Carl Smith, an inmate porter, via affidavit.  (Doc. 107-1, p. 19; Doc. 111-1, p. 102).  Maue confronted Plaintiff and said: "I should fuck you up. You're little but I still [sic] take you into the shower, take those handcuff off you and beat the shit out of you."  (Doc. 107-1, p. 20).  Maue continued: "You think you're smart, don't you, using those big words? But what good is being smart in jail going to get you, huh?  Who are you going to write to when your cellie is fucking you in the ass?  How did you survive all these years? Oh I know, you on death row.  You a killer."  (Doc. 107-1, p. 20).  Todaro then said, "You're not on death row anymore."  (Doc. 107-1, p. 20).  Plaintiff interpreted this as a threat, because the guards believe that inmates on death row had previously been granted special treatment.  (Doc. 107-1, p. 20).  Chandler also said: "You're not on death row anymore, you better get used to it.  You're not going to get what you want."  (Doc. 107-1, p. 20).  Maue then said, "No haircut for you.  When you get out of seg, you're going to have a beard.  You're not even going to get a razor back there."  (Doc. 107-1, p. 20).  Maue does not recall interacting with Plaintiff on November 11, 2011.  (Doc. 107-2, p. 3).

Clover also took away Plaintiff's carry bag, which contained hygiene items and his sheets, saying "You're not carrying shit." (Doc. 107-1, p. 20).  Clover then instructed an inmate porter to pick up the bag.  (Doc. 107-1, p. 20).

Plaintiff said nothing in response to the comments—he claims that he tried to pay as little attention to the situation as possible because he believes that when an inmate is in a situation like that with people who have authority and control over the inmate, the worst thing to do is to speak up and exacerbate the situation. (Doc. 107-1, p. 21). In Plaintiff's opinion, there's nothing to say when you're handcuffed in front of four correctional officers and at their mercy. (Doc. 107-1, p. 21).

Plaintiff believes that Maue's comment about big words was a reference to him filing grievances because he had never had a confrontation with Maue outside of this chain of events. (Doc. 107-1, p. 20). Maue denies being aware of Plaintiff's grievances or previous lawsuits. (Doc. 107-2, p. 3). He also denies that he conspired with other officers to retaliate against Plaintiff. (Doc. 107-2, p. 3).

Todaro told Waller and Clover to escort Plaintiff to segregation and directed Maue and Chandler to fall back. (Doc. 107-1, p. 20). Todaro then called segregation and said "we got one coming to you, but this one here I'm going to talk to you about." (Doc. 107-1, p. 20). Todaro does not recall interacting with Plaintiff on this date, and he does not recall being aware of Plaintiff's past grievances and lawsuits. (Doc. 107-5, p. 1).

Plaintiff received a ticket later that evening for intimidation, threats, and insolence based on comments he allegedly made to Lindsey while Lindsey was rapping the bars. (Doc. 107-1, p. 22; Doc. 107-4, p. 4-5). Plaintiff filled out the witness part of the form when he received the ticket. (Doc. 107-1, p. 22). On November 16, 2011, he went before the adjustment committee. (Doc. 107-1, p. 22). According to Plaintiff, the committee consisted of Brandon Anthony, Rebecca Cowan, and Michael Mifflin. (*Id.*).

Plaintiff alleges that he had a lawsuit pending against Cowan and Anthony at the time of this hearing. (Doc. 107-1, p. 26). Plaintiff pled not guilty. (Doc. 107-1, p. 23). He stated that he never said anything to Lindsey. (Doc. 107-1, p. 23). The adjustment committee told Plaintiff that they had spoken to his witnesses. (Doc. 107-1, p. 23). The adjustment committee report notes that both witnesses were interviewed and they both confirmed that Plaintiff had not said anything to the officer. (Doc. 107-4, p. 6). The disciplinary report also listed Lucas Maue as a witness, but Plaintiff did not see Maue with Lindsey that morning. (Doc. 107-1, p. 24). The adjustment committee noted that Maue confirmed Lindsey's version of events. (Doc. 107-4, p. 6). They found Plaintiff guilty. (Doc. 107-1, p. 23). Plaintiff received 6 months C grade, 6 months segregation, and 6 months commissary restriction. (Doc. 107-1, p. 23).

Plaintiff believes that Cowan should have excused herself from participating in his hearing because of his prior lawsuit against her. (Doc. 107-1, p. 28). He believes that her job as an internal affairs officer would put her in a position where she could have known about his grievances. (Doc. 107-1, p. 28-29). Plaintiff believes that Cowan is the type to retaliate. (Doc. 107-1, p. 29). Cowan submitted an affidavit that she was the person who interviewed Plaintiff's two witnesses and recorded their statements. (Doc. 107-6, p. 2). She did not serve as a member of the adjustment committee and therefore had no say in whether Plaintiff was found guilty or what discipline he received. (Doc. 107-6, p. 2). She did not tell Mifflin or Anthony about Plaintiff's prior lawsuit against her and would not have acted differently based on it. (Doc. 107-6, p. 2).

Anthony submitted an affidavit confirming that Cowan had no say in the ticket ruling. (Doc. 107-7, p. 2). He also said that he was not aware prior to that hearing that Plaintiff had filed a lawsuit naming him. (Doc. 107-2, p. 2). He was not aware of any grievances filed by Plaintiff. (Doc. 107-2, p. 2). Cowan did not tell Anthony that Plaintiff had previously named her in a lawsuit. (Doc. 107-2, p. 2). Anthony would not have changed his decision had he been aware of these facts. (Doc. 107-2, p. 2).

After he was released from segregation, Plaintiff was assigned to the West cell house, which is a more aggressive cell house and home to more problematic inmates. (Doc. 107-1, p. 26). There are more fights in West cell house, and as a consequence, more periods of lockdowns. (Doc. 107-1, p 26).

### Summary Judgment Standard

Summary judgment is appropriate if the evidence, considered in totality, demonstrates that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Dynegy Mktg. & Trade v. Multiut Corp.*, **648 F.3d 506, 517 (7th Cir. 2011).** Initially, the movant has the burden to demonstrate to the court that there is a lack of a genuine issue as to the material facts based on the admissible evidence on the record. *Celotex Corp. v. Catrett*, **477 U.S. 317, 323 (1986).** Once a proper motion for summary judgment has been made, the non-moving party must then demonstrate that genuine issues of material fact do exist. FED. R. CIV. P. 56(e). If the evidence presented would allow a reasonable jury to find for the non-moving party, then a genuine issue of fact exists. *Anderson v. Liberty Lobby*, **477 U.S. 242, 248 (1986).**

When a court hears a motion for summary judgment, it will review the evidence in a light most favorable to the non-moving party. That being said, summary judgment is not appropriate when evidence in the record indicates that "alternative inferences can be drawn." *Anderer v. Jones*, **385 F.3d 1043, 1064 (7th Cir. 2004).**

## Analysis

### 1. Retaliation Claims

The bulk of Plaintiff's complaint concerns retaliatory conduct, so the Court will start with Defendants' motions for judgment as to those claims. An inmate has a constitutional right to file a grievance as a part of his right of access to the courts under the First Amendment. *DeWalt v. Carter*, **224 F.3d 607, 618 (7th Cir. 2000)**. To succeed on a retaliation claim, a plaintiff must prove that he engaged in conduct protected by the First Amendment, that he suffered a deprivation that would likely deter future protected activity, and that the protected conduct was a motivating factor for taking the retaliatory action. *Bridges v. Gilbert*, **557 F.3d 541, 546 (7th Cir. 2009).** On the third element, the burden of proof is split. *Mays v. Springborn*, **719 F.3d 631, 634 (7th Cir. 2013)**. First, the plaintiff must show that the defendant's conduct was sufficient to cause the injury—that is, that the protected conduct was a motivating factor for taking the retaliatory action. *Id.* **at 635.** The burden then shifts to the defendant to rebut by showing that the action would have occurred anyway, regardless of the motive. *Id.*

One of the officers who allegedly retaliated against Plaintiff was Officer Maue: Maue allegedly threatened Plaintiff on October 31st and November 11th because he complained about the barber policy. As an initial matter, the threshold order split

Plaintiff's complaints about Maue's conduct into two counts, one based on the October incident and one based on the November incident. However, Plaintiff's evidence shows that the two incidents were not isolated from each other, but were part of the same pattern of events. *Bridges* suggests that acts that may not be actionable in of themselves could be actionable together if they were taken in retaliation for protected activity. **557 F.3d at 552**. Having the opportunity to reconsider the threshold order, the Court finds it more appropriate to consider the claims against Maue as one course of action.

Maue argues that he is entitled to judgment on Plaintiff's claim because Plaintiff has no evidence that Maue knew about the October 30th grievance. However, retaliatory motive can be shown by more than an admission of knowledge. Suspicious timing, for example, can suggest animus. *Zimmerman v. Tribble*, **226 F.3d 568, 574 (7th Cir. 2000)**. Timing alone may not be sufficient, but along with other evidence and context, all of the evidence together may create an inference that an act was motivated by grievance-related animus. *Greene v. Doruff*, **660 F.3d 975, 980 (7th Cir. 2011)**.

Here, Plaintiff has submitted evidence that he had an interaction with Dethrow about the barber policy and that within fifteen minutes Maue had confronted him over the barber conversation and threatened him with segregation if he kept complaining. This creates an inference that Dethrow told Maue about her conversation with Plaintiff. Additionally, crediting Plaintiff's testimony, Maue warned Plaintiff that there would be consequences for complaining even before Plaintiff filed his grievance.

Plaintiff then filed a grievance by placing it in his cell bars to be picked up by the gallery officer. It is certainly possible that the gallery officer shared the contents of the

grievance with other officers on the gallery, and Maue's prior conversation with Plaintiff shows that he had developed an interest in Plaintiff's complaints about the barbershop matter. Then, within one day, Maue aggressively bar rapped Plaintiff's cell, and made further comments regarding inmate complaints. Specifically, Maue stated that he would continue harassing the inmates until they stopped complaining. In light of the timing and Maue's prior comments and interest in Plaintiff's complaints, the Court finds that Plaintiff has submitted sufficient evidence from which a reasonable jury could conclude that Maue was motivated by Plaintiff's act of filing the grievance when he aggressively rapped the cell bars on October 30, 2011.

Then, on November 11, 2011, Maue allegedly taunted Plaintiff, saying that there was no one for him to write to now and that his use of big words would not help him. This could be interpreted as a reference to grievances. Maue also told Plaintiff that he would not be getting a haircut in segregation, which could be a reference to Plaintiff's grievance regarding the barbershop matter. Additionally, the Court may consider Plaintiff's allegations of October 30th, less than two weeks prior to this incident, as providing context. On these facts, Plaintiff has submitted sufficient evidence from which a jury could conclude that Maue was motivated by Plaintiff's grievances.

Maue makes a number of other arguments to justify summary judgment in his favor, but none hold water. He first says that judgment should be entered for him because the bar rapping never happened, but at this stage, the Court must credit Plaintiff's testimony and the testimony of his inmate witnesses that it did occur. He also argues that bar rapping, a practice that occurs every day in a maximum security

institution, would not deter a person of ordinary firmness from filing grievances. But Plaintiff's testimony indicates that the bar rapping was particularly aggressive here—it was not the kind of bar rapping usually employed by the guards, but was loud, fast, hard, and caused paint chips to fly off the bars. On these facts, a reasonable person could interpret the October 31st incident as a threat of violence, and sufficient to deter a person of ordinary firmness from filing grievances, especially when taken in combination with subsequent events. Maue makes the same argument about his alleged statements to Plaintiff prior to Plaintiff's placement in segregation, but Maue didn't just taunt Plaintiff before he was placed in segregation. He threatened violence— he said he should take Plaintiff into the showers and beat him—and that statement rises above common insults. On these facts, a jury could find that a reasonable person would be deterred, so summary judgment in Maue's favor is improper.

Another officer who purportedly retaliated against Plaintiff is Todaro, who was present while Maue and others made threats against Plaintiff on November 11th, made a statement about death row that Plaintiff regarded as a threat, and called ahead to segregation to tell the guards that he wanted to talk to them about Plaintiff prior to his arrival in segregation. Todaro has moved for summary judgment on the retaliation claim against him, arguing that Plaintiff has not shown that his conduct had anything to do with Plaintiff's grievances. That's correct—unlike Maue and some of the other officers involved during the entirety of the barbershop matter, there's no evidence that Todaro was aware of Plaintiff's grievances, meaning that he couldn't have been motivated by retaliatory animus. Once more, there is no evidence that Plaintiff was

treated differently once he went to segregation, and thus no indication that Todaro's statement to the segregation guards was meant for the purpose of intimidation or retaliation. On these, facts it is equally plausible that Todaro believed that Plaintiff's disciplinary report was accurate as written and that he legitimately thought that Plaintiff was making unreasonable demands. He is entitled to summary judgment.

Next up is Officer Lindsey, who Plaintiff says retaliated against him on November 11 by issuing him the disciplinary ticket that sent him to segregation. Lindsey maintains that Plaintiff has not submitted a sufficient case as to him because Plaintiff's sole evidence that the disciplinary ticket was retaliatory is that Plaintiff does not know why else Lindsey would have written the ticket, evidence that Lindsey dismisses as speculation. However, Lindsey ignores other evidence submitted by Plaintiff. As an initial matter, Plaintiff has his own testimony and the testimony of several inmate witnesses that he did not commit the conduct alleged in the ticket. The Court must credit this testimony on summary judgment, and therefore the Court cannot draw the inference that Lindsey had a proper motive in writing the ticket. *See Hale v. Scott*, **371 F.3d 917, 920 (7th Cir. 2004)**. Plaintiff has also submitted evidence that Dethrow told him that she discussed his grievances about the barbershop with other staff. Plaintiff also found an anonymous note written on guard paperwork. This creates a reasonable inference that some of the guards knew about Plaintiff's grievance activity, and given Lindsey's involvement with the ticket, a jury could determine that Lindsey was one of those guards. Lindsey is not entitled to summary judgment.

Plaintiff's last retaliation claim is directed at Mifflin, Cowan, and Anthony, who were involved with the disciplinary hearing on Officer Lindsey's ticket and allegedly convicted Plaintiff of the offense in the ticket because of his prior lawsuits against them. The claim against Mifflin fails at the gate, as Plaintiff has not alleged that he ever sued Mifflin, so there is no way that Mifflin could have been motivated by retaliatory animus. The claim against Anthony fails for similar reasons: unlike Mifflin, it looks as if he was sued before by Plaintiff in this Court (Case No. 10-cv-264), but there's no proof he knew about the suit, and thus no basis for a jury to find that he acted with retaliatory animus. Court records show that Anthony was dismissed at screening from the case in question, and thus was never served. He has submitted an affidavit that he was not aware of any prior lawsuit against him, and that affidavit has gone unrebutted.

As to Cowan, it does appear that she was a defendant in Case No. 10-cv-0264, but there's nothing in the record to suggest that she committed any unfavorable act against Plaintiff. She had no role in determining whether he was guilty or innocent; she cast no vote in the proceeding whatsoever. And while she was involved in interviewing Plaintiff's witnesses, the adjustment committee report shows that she completed those interviews and that the witnesses testified consistently with Plaintiff's witness request form. On these facts, Plaintiff doesn't have a viable retaliation claim against Cowan.

## 2. Due Process Claim

Plaintiff also claims that Mifflin, Cowan, and Anthony conducted the disciplinary hearing in a way that violated his due process rights. Prison disciplinary hearings satisfy procedural due process when an inmate is provided written notice of

the charge against the prisoner twenty-four hours prior to the hearing; the right to appear in person before an impartial body; the right to call witnesses and present physical and documentary evidence (when doing so will not unduly jeopardize the safety of the institution or its correctional goals); and a written statement of the reasons for the action taken against the prisoner. *See Wolff v. McDonnell*, **418 U.S. 539, 555 (1974);** *Cain v. Lane*, **857 F.2d 1139, 1145 (7th Cir. 1988)**.

Plaintiff doesn't allege much about the hearing that could be objectionable: he admitted that he was served with the ticket, signed it, and had a hearing at which the testimony of his proffered witnesses was considered.[1] The committee also heard from Lindsey and Maue, and chose to credit their testimony over Plaintiff's. Lindsey and Maue may have been lying, but there is no evidence that the committee knew that, and on this record the committee was entitled to credit their testimony over Plaintiff's. Plaintiff's only due process claim, then, is that the body was not impartial because of Plaintiff's prior suits. Those claims fail for the same reason that the retaliation claims failed: Mifflin was never sued; Anthony never knew about a suit (and thus couldn't act impartially based on it); and there's nothing to suggest that Cowan acted improperly.

### 3. Conspiracy Claim

Plaintiff's next claim is that Dethrow, Maue, Lindsey, Todaro, and Grathler all conspired with each other to intimidate and retaliate against him in violation of the First Amendment. To succeed on a § 1983 conspiracy claim, the plaintiff must prove that an

---

[1] In the Court's experience, it is a rare occurrence indeed for the adjustment committee to actually take the time to interview inmate witnesses.

official and a private individual reached an understanding to deprive the plaintiff of his constitutional rights, and those individuals were willful participants in the unlawful activity with the state actor. *Cooney v. Casady*, **735 F.3d 514, 518 (7th Cir. 2013)**. Typically, the evidence must reflect a "concerted effort" between the parties. *Whitlock v. Brueggemann*, **682 F.3d 567, 577 (7th Cir. 2012)**. It is not enough for the conspirators to share the same objective; rather, a conspiracy requires that there be an agreement, express or implied, to reach a desired result. *Cooney*, **735 F.3d at 519**.

All the defendants in this case are state actors, so it is likely that the conspiracy claim is superfluous and unnecessary. *See Turley v. Rednour*, **729 F.3d 645, 649 n.2 (7th Cir. 2013).** However, Defendants have not raised that point, so it is waived. Setting aside the superfluous issue, the Court finds there is sufficient evidence to support Plaintiff's conspiracy claim against Maue, Dethrow, and Lindsey. Plaintiff's evidence suggests that Dethrow and Maue discussed Plaintiff's actions between them based on comments they made to Plaintiff: Maue confronted Plaintiff over his complaints about the barbershop policy within minutes of him making those comments to Dethrow, and Dethrow told Plaintiff that she had discussed Plaintiff's grievances with other staff members of South Lowers (a group that could have included Maue). Dethrow also allegedly threatened Plaintiff days before he was issued a disciplinary ticket, and Dethrow is the officer who told Plaintiff about the allegedly false disciplinary ticket. A reasonable jury could infer from this evidence that Dethrow and Maue were communicating about Plaintiff's grievances, making threatening comments to Plaintiff about his grievances, and had resolved to do something about the grievances.

There is also enough evidence to infer that Lindsey may have known about the grievances. Lindsey has written an allegedly false disciplinary report, to which Maue is listed as a witness, although neither side has submitted any evidence that he was present for the bar rapping or the events surrounding it. In fact, Maue, despite testifying at Plaintiff's disciplinary hearing that he observed Plaintiff's comments to Lindsey, recalls no interactions with Plaintiff on November 11. (Doc. 107-2). It is plausible that Lindsey conspired with Maue when he wrote the disciplinary report. Therefore, Plaintiff's conspiracy claims against Dethrow, Maue, and Lindsey survive.

The same is not true of Todaro or Grathler. As discussed more fully above, Todaro's participation in the events is limited to one inappropriate remark and an ambiguous phone call—there is no evidence that Todaro knew about Plaintiff's prior grievances. Likewise, the only allegation against Grathler is that he asked Plaintiff for his identification at one point. There is no allegation that Grathler threatened Plaintiff as Maue is alleged to have done during the same incident. There is also no evidence that Grathler participated in any of the subsequent conduct that Plaintiff complains about. No reasonable jury could infer from these facts that Grathler or Todaro entered into an agreement with the other defendants to deprive Plaintiff of his rights.

## 4. Illinois Constitutional Claims

Plaintiff's final claims are raised under the Illinois Constitution—he claims that the intimidating and retaliatory acts of all of the defendants violated some of its amendments. It's critical to remember that the Illinois Constitution does not guarantee rights in the same manner as the United States Constitution—a provision of the Illinois

Constitution cannot be the basis of a lawsuit unless it contains self-executing language establishing such a right. *Bourbeau v. Pierce*, **No. 02-cv-1207, 2008 WL 370677, at \*6 (S.D. Ill. Feb. 11, 2008).** For example, Article 1 Section 17 of the Illinois Constitution says that its rights are enforceable without action by the General Assembly, while Sections 2 and 5 of Article 1 contain no such language. **ILL. CONST. art. I, §§ 2 & 5;** *Teverbaugh ex rel. Duncan v. Moore*, **724 N.E.2d 225, 228 (Ill. Ct. App. 2000).**

When the Court screened this case on threshold review, it did not analyze Plaintiff's constitutional claims in any depth. Having now done so, the Court concludes that Plaintiff has failed to state a claim upon which relief could be granted because the Illinois Constitution does not provide Plaintiff with a private right of action.

## Conclusion

Defendants' motion for summary judgment (Doc. 106) is **GRANTED in part** and **DENIED in part.** Summary judgment is **GRANTED** as to the retaliation claims against Todaro, Mifflin, Cowan, and Anthony; it is **GRANTED** as to the due process claims against Mifflin, Cowan, and Anthony; it is **GRANTED** as to the conspiracy claims against Todaro and Grathler; and it is **GRANTED** as to the Illinois Constitution claims against all of the defendants. That ruling disposes of all of the claims against Todaro, Mifflin, Anthony, Cowan, and Grathler, so the Clerk of Court is **DIRECTED** to enter judgment in their favor at the close of this case. Summary judgment is **DENIED** as to the retaliation claims against Maue and Lindsey, and it is **DENIED** as to the conspiracy claims against Dethrow, Maue, and Lindsey. Those claims will proceed.

IT IS SO ORDERED.

DATED:  April 26, 2016

/s/ Michael J. Reagan
Chief Judge Michael J. Reagan
United States District Court
